IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

ERROL ALFRED, KERRY
FERNANDEZ and JORDAN
DUNHAM,

　　　　　　　　Defendants.

CRIMINAL CASE NO.

1:16-CR-00245-WSD-JFK

## REPORT AND RECOMMENDATION

Pending before the court are Defendant Errol Alfred's motion [Doc. 50] to suppress evidence obtained during the execution of a search warrant for his residence, 352B Asbury Commons, Atlanta, Georgia, and motion [Doc. 56] to suppress evidence obtained during a consent search of his Nissan Altima on August 3, 2016.  An evidentiary hearing was held on the pending motions on April 26, 2017.  [Doc. 83].[1] The parties have filed post-hearing briefs in support of and opposition to the pending motions to suppress.  [Docs. 84 and 86].  Also pending before the court is Defendant's motion [Doc. 78] to sever Counts 19 and 20 (alleging financial transaction fraud) for trial from Counts 1 through 18 (alleging crimes associated with firearms trafficking

_____

[1]Citations to evidentiary hearing transcript are:  (Tr. at ).

and exporting).  The Government does not oppose the motion for severance.  [Doc. 84 at 2].  Accordingly, the court recommends that the motion for severance be granted.

Defendants Fernandez and Dunham did not file any pretrial motions.

## I.   Background Facts

On June 29, 2016, the federal grand jury returned a fifteen count indictment against Defendant Alfred in which he was alleged to have made, or caused another person to make, false statements in connection with the acquisition of firearms and to have unlawfully exported firearms to a place outside of the United States and, in doing so, having failed to comply with laws and regulations governing such exports.  [Doc. 1].  On August 1, 2016, a federal search warrant and application was presented to Magistrate Judge Justin S. Anand.  [Doc. 50-1 ("Search Warrant"); Doc. 50-2 ("Affidavit")].

The application sought authorization to search 352B Asbury Commons, Atlanta, Georgia ("Target Residence"), for evidence relating to violations of 18 U.S.C. § 922(a)(6) (causing false information to be kept in the records of a Federal Firearm Licensee ("FFL")) and § 544 (unlawful exportation of firearms).  The warrant authorized the seizure of firearms and ammunition; ledgers, paperwork, receipts and documents regarding the theft, purchase, sale and transfer of firearms and ammunition;

2

containers, boxes and packaging for firearms or ammunition; applications or membership cards for firearms related clubs and shooting ranges; photographs, targets or spent cartridge casings; paperwork, identification or documents indicating indicia of ownership or occupancy for the Target Residence; cell phones or electronic media devices used for communication and coordination of firearms sales and distribution; and export documents, receipts, and related paperwork regarding shipments from the United States to foreign countries, including, Trinidad.  [Search Warrant, Attachment B].

In support of the warrant, the Government provided the affidavit of Jonathan P. Gray ("Affiant"), Special Agent, Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF").  Affiant began by setting forth his training and experience, having been employed with ATF since 2001 and having prior experience as a police officer with the Columbus Police Department.  [Affidavit ¶ 1].  He received training both at the local and federal law enforcement academies.  Additionally, Affiant attended training while employed.  [Id. ¶ 2].  While an ATF agent, Affiant worked numerous firearms and narcotics related investigations and executed search and arrest warrants involving illegally purchased and trafficked firearms and narcotics and seized items associated with such crimes, such as, books, ledgers, records, computers and cellular

AO 72A
(Rev.8/82)

telephones.  Affiant also debriefed defendants, witnesses and informants regarding the unlawful purchase, sale and distribution of firearms and narcotics, including, involving straw purchasers of firearms.  [Id. ¶¶ 3-4].

Based on this training and experience, Affiant provided information about the conduct of firearm traffickers, including, that they maintain notes, ledgers and other documents to track weapon purchases and sales and monetary proceeds; that they utilize cell phones, computers and other electronic devices to coordinate firearm transactions; and that they pose for and keep photographs of their activities in their residences and keep evidence of shooting experiences.  [Id. ¶¶ 8-11].  He also provided information about individuals violating the export regulations, including, that they maintain records online and utilize internet programs, utilize emails and other computer files, which are maintained for long periods, in connection with export activities and that the Code of Federal Regulations requires export transaction records to be maintained for five years and that such records must be made available at the request of various federal agencies.  [Id. ¶¶ 12-13].

In support of probable cause, Affiant related that the federal grand jury had indicted Defendant and his co-Defendants for making false statements to FFLs with Defendant using his co-Defendants and others to make numerous firearm purchases

and that, from August 2013 to September 2014, thirty-six firearms were purchased. [Id. ¶¶ 1-20]. Affiant advised that Defendant was interviewed on October 30, 2014, and that he stated he was born in Trinidad, was a naturalized United States citizen and moved to the Target Residence with his girlfriend, co-Defendant Dunham, in May 2014. Defendant admitted to purchasing some firearms and that Dunham had purchased some firearms but claimed that all of the firearms had been stolen - however, he changed his statement several times as to when and where the thefts occurred. Affiant advised that Defendant shook and stammered while speaking. [Id. ¶¶ 21-22]. When asked about his most recent purchase, Defendant again was "very nervous" and, believing that Dunham, who had been arrested the night before, provided information to the agents, asked what she had said. [Id. ¶ 23].

On November 26, 2014, agents spoke to Dunham, and she admitted purchasing firearms for Alfred, who took the firearms, but she denied knowing what he did with the guns. [Id. ¶ 24]. She also admitted shipping packages to Trinidad with Defendant that contained "clothing and household goods" on two occasions but denied that the packages contained firearms or witnessing Defendant shipping firearms. [Id. ¶ 25]. She also identified others, including, "Haiti," identified as Amedee Jean-Baptiste, who had made firearm purchases for Defendant and that those firearms were given to

AO 72A
(Rev.8/82)

Defendant. [Id. ¶ 26]. Affiant also recounted an interview with Baptiste on November 12, 2014, in which he admitted buying firearms for Defendant and turning the firearms over to Defendant. [Id. ¶ 27].

In December 2014, agents met with a manager at Amerijet International, Inc., and obtained records for packages shipped by Defendant and Dunham and/or to the same location in Trinidad. They obtained records of five shipments and identified co-Defendant Fernandez, who handled one of the shipments. [Id. ¶ 29]. Agents spoke to Fernandez in December 2014. Although he denied purchasing firearms for Defendant, he admitted driving Baptiste to purchase a firearm. [Id. ¶¶ 30-31]. He initially denied shipping anything to Trinidad, but, when confronted with the paperwork, he admitted shipping clothing and food items and that Defendant loaded the shipping barrel and paid for shipping - Fernandez could not explain why he completed the shipping paperwork. [Id. ¶ 32]. In December 2014, the location to which the shipments were sent was determined to be a private residence. [Id. ¶ 33].

Baptiste was interviewed again on October 5, 2015, about shipments to Trinidad. He advised that in Summer 2014, Defendant wanted him to ship food to Trinidad, and he agreed but stated that when the suitcases were delivered, they were "very heavy" and contained "coffee containers wrapped in saran wrap." Defendant retrieved the

6

suitcases and said he would ship them to Trinidad. [Id. ¶ 34]. Baptiste then admitted that Defendant, in July or August 2014, asked him to ship firearms to Trinidad and advised that Dunham had already done so. Baptiste said he refused, and a few weeks later, Defendant advised the firearms were gone. Defendant said that he was "trying to send guns back home." [Id. ¶ 35]. And Baptiste related a conversation with Fernandez, after telling him about being interviewed by agents. Fernandez told Baptiste to say he lost the firearms he purchased and that he, Fernandez, told the agents he shipped food but, laughing, said the shipment really contained firearms hidden in the food. Defendant arrived and admitted sending firearms to Trinidad for years and advised Baptiste not to worry. Defendant and Fernandez explained that a cousin worked for the Trinidad government, that he picked up the firearms and that he sold them for $2,000 each. [Id. ¶ 36].

Affiant then provided information about the Target Residence based on an investigation conducted in July 2016. A vehicle was registered to Defendant at the Target Residence, with the tag being renewed in March 2016. [Id. ¶ 37]. The agents also confirmed that the Target Residence was leased to Defendant and a Marc Walcott from May 2016 through May 2017. [Id. ¶ 38].

7

On August 3, 2016, at 6:00 a.m., Agent Gray[2] and approximately twelve to fifteen other agents arrived at 352B Asbury Commons, Defendant's residence, to execute the federal arrest warrant for Defendant and the search warrant for the residence. (Tr. at 8-10, 13, 48-49). He and the other agents were attired in tactical gear and carried firearms. (Tr. at 13, 39-40). Before arriving, as case agent, Agent Gray discussed the search warrant's list of items to be seized with the other agents and assigned tasks to the other agents. (Tr. at 10-13, 50, 70). At approximately 6:03 a.m., Agent Gray knocked on the door to the residence and shouted, "police with a search warrant, open the door" - repeating himself when no one answered. (Tr. at 14). The door was then forced open. (Tr. at 14).

When the agents entered the residence, they observed Defendant, dressed in his underwear, standing in the living room hallway. (Tr. at 14-15, 51; Gov't Exh. 1). Defendant obeyed commands to raise his hands and to advance slowly; he was then handcuffed. (Tr. at 15). In order to secure the residence, Defendant was briefly taken outside while the security sweep of the residence was conducted. Defendant was then

---

[2]The agent worked in the group investigating firearm trafficking, that is, the movement of firearms from the legal to illegal market, and he related his training and experience, including participating in executing hundreds of arrest and search warrants. (Tr. at 7-8).

8

returned inside the residence.  (Tr. at 15-16, 19).  He was allowed to dress, and, because it was the only room with a working light, placed in the bathroom and seated on a chair brought into the room.  (Tr. at 19-20, 39; Gov't Exh. 5).

Agent Gray and Special Agent Ari Lienwand, Bureau of Industry and Security ("BIS"), spoke to Defendant, first advising him of the agents' identities and that he had been indicted and then completing the Marshal's Booking Form.[3]  (Tr. at 19-21, 38, 39).[4]  Agent Gray then asked Defendant if he minded the agents searching his vehicle, a Nissan Altima, that Defendant had advised was parked nearby.  (Tr. at 23-24; Gov't Exh. 6).  After Defendant verbally responded in the affirmative and after filling out

---

[3]In order to provide some of the contact information that the form requested, Defendant asked that his cellular telephone be retrieved from his bedroom.  Agent Lienwand did so.  (Tr. at 19-20, 26-27; Gov't Exh. 6).  The agent subsequently seized the telephone based on the list of items authorized to be seized by the search warrant.  (Tr. at 27, 36, 62-63; Gov't Exh. 62).  As the affidavit for the search warrant indicated, Agent Gray testified that the cellular telephone, and the laptop discussed *infra*, may contain evidence of smuggling firearms, such as, in emails, checking account information, photographs and other communications with third parties.  (Tr. at 36-37).  Agents subsequently obtained search warrants to examine the contents of the phone and laptop.  (Tr. at 42-43).

[4]The interview with Defendant was recorded.  (Tr. at 21-22; Gov't Exh. 6).  The undersigned listened to the recording which reflects that Defendant was calm, did not appear to be under stress and was cooperative.  The recording also indicates that the agents' tone was pleasant, non-threatening and non-coercive.  The recording corroborates Agent Gray's testimony regarding the consent to search set forth *infra*.

9

information on the form, the agent presented a consent to search form to Defendant.

(Tr. at 23-25, 38; Gov't Exhs. 6 and 7).  The form provides:

> I understand that I have right to refuse to give my consent to a search and may demand that a search warrant be obtained prior to any search of the person or property described below.

> I understand that any contraband or evidence of a crime found during the search can be seized and used against me in any court of law or other proceeding.

> I understand that I may consult with an attorney before or during the search.

> I understand that I may withdraw my consent to this search at any time prior to the search's termination.

> This consent to search has been given voluntarily without promises, threats, coercion or force of any kind whatsoever.

> I have read the above statement of rights, understand these rights, and hereby authorize agents of the Bureau of Alcohol, Tobacco, Firearms and Explosives to conduct a complete search of the property described below.

(Tr. at 24-25; Gov't Exh. 7).  Defendant, who was then, and thereafter remained, un-handcuffed, executed the form.  (Tr. at 25, 37, 40).  Agent Gray testified that nothing indicated that Defendant's consent was involuntary or that he did not understand the form.  He did not withdraw his consent.  The two agents were not "looming over" Defendant, did not threaten Defendant, did not make promises to Defendant and did

10

not yell at Defendant.  Their weapons were not drawn.  (Tr. at 26, 39, 42).  The search of the vehicle apparently produced "miscellaneous documents."  (Gov't Exh. 66 at 1).

When the agents initially entered the residence, on the couch in the living room, they observed a laptop computer with a credit card reader, "skimmer," attached by cable and several credit cards lying nearby.  (Tr. at 16, 52-53).  Agent Gray testified that he believed that Defendant was "doing some type of credit card fraud" and confirmed his suspicions with ATF Agent Jon Jenkins, formerly an agent with the Secret Service, who stated, "[T]his is going to be credit card fraud.  I've dealt with this numerous times."[5]  (Tr. at 16-18, 43; Gov't Exhs. 2, 3 and 4).  The laptop computer was seized both as being identified on the list of items to be seized and as being evidence of fraudulent activity.  (Tr. at 17-18, 34, 37, 63; Gov't Ex. 62).  In a Bible located on the mantel in the living room, a counterfeit driver's license was found; the license bore Defendant's photograph but a different name and address.  This item was seized both as being listed as an item to be seized, that is, identification indicating

---

[5]Special Agent Don Dorman, who was the designated evidence technician for the search warrant, likewise stated that the laptop computer connected to the skimmer was evidence of fraud and that he confirmed his belief with Agent Jenkins.  (Tr. at 52-53).

AO 72A
(Rev.8/82)

indicia of occupancy, and as evidence of fraud.  (Tr. at 28-30, 63; Gov't Exhs. 59, 60 and 62).

Agents also seized a number of documents which were listed on the items to be seized, including, money order receipts (documents evidencing transactions and receipt of funds relating to firearms trafficking), a ledger (evidencing records of firearm transactions) and Defendant's Trinidad and United States passports and social security card (indicating indicia of occupancy).  (Tr. at 30-34, 61, 63-64, 71-74, 76; Gov't Exhs. 61, 76 and 77).  In the kitchen, Agent Dorman found a bag and searched the contents, based on the authority in the search warrant to search for documents indicating indicia of occupancy and evidencing shipping and transporting firearms. Although he did not know what was in the bag, he stated that the bag was large enough to contain those items.  (Tr. at 54, 64-66; Gov't Exhs. 63 and 64).  In the bag, he found a number of credit cards, some in Defendant's name, which he believed established both indicia of ownership of the bag and occupancy and constituted evidence of fraud, especially in light of the other items found in the residence.  (Tr. at 55, 62, 64-65). Agents also found and seized a credit card embossing machine, as identified by Agent Jenkins, which was used to make credit cards and was evidence of fraud.  (Tr. at 34, 56, 62; Gov't Exh. 65).

12

Additional information will be set forth as necessary during discussion of the pending motions to suppress.

## II.  Discussion

### a.  Search Warrant

Defendant Alfred contends that the affidavit for the search warrant for his residence fails to establish a nexus between the items to be seized and his residence. [Docs. 50 and 86 at 5-6].  Defendant also contends that the credit cards, LG Smart phone, various forms of identification, LG laptop computer with credit card reader,[6] Defendant's United States passport and Social Security card and Trinidad passport, credit card embosser, money orders and receipts, and small ledger seized during the execution of the search warrant for his residence exceeded the scope of the search for the items for which the search was authorized.  [Docs. 50, 54 and 86 at 6].  Defendant, also initially asserted that the good faith exception to the exclusionary rule is not applicable.  [Doc. 50].  The Government responds that the search warrant affidavit establishes probable cause for the search, that the items seized during the search, if not specified on the warrant, were lawfully seized pursuant to the plain view doctrine, and

---

[6]Defendant also initially challenged the seizure of a Notebook computer [Doc. 54 ¶ 8]; however, that computer belonged to his daughter and was not searched.

that the good faith exception applies in this case.  [Doc. 84 at 9-20].  In reply, Defendant summarily asserts that the affidavit does not establish a nexus between his residence and the items to be seized and, as to the items seized, only challenges the search of the bag (found in the kitchen) containing the credit cards on the grounds that the agent, not knowing what was in the bag, did not have authority to look inside. Defendant presents no further arguments, including, failing to further challenge application of the good faith doctrine.  [Doc. 86].

The issuing magistrate judge, in deciding whether to sign a search warrant, is "'simply to make a practical, common sense decision whether, given all the circumstances set forth in the affidavit before him, including the veracity and the basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.'"  United States v. Jiminez, 224 F.3d 1243, 1248 (11th Cir. 2000) (quoting Illinois v. Gates, 103 S. Ct. 2317, 2332 (1983)) (internal quotation marks omitted).  In this regard, "'probable cause is a fluid concept – turning on the assessment of probabilities in particular factual contexts[.]'"  United States v. Brundidge, 170 F.3d 1350, 1352 (11th Cir. 1999) (quoting Gates, 103 S. Ct. at 2329).  For this reason, "[c]ourts reviewing the legitimacy of search warrants should not interpret supporting affidavits in a hypertechnical

14

manner; rather, a realistic and commonsense approach should be employed so as to encourage recourse to the warrant process and to promote the high level of deference traditionally given to magistrates in their probable cause determinations." United States v. Miller, 24 F.3d 1357, 1361 (11th Cir. 1994) (citing Gates, 103 S. Ct. at 2331-32; United States v. Ventresca, 85 S. Ct. 741, 746 (1965)); accord United States v. Hatcher, 300 Fed. Appx. 659, 663 (11th Cir. 2008) (same).  In reviewing the issuance of a search warrant, the undersigned must determine only that the issuing judge had a "substantial basis" for concluding that probable cause existed to uphold the warrant. See Gates, 103 S. Ct. at 2331; see also Massachusetts v. Upton, 104 S. Ct. 2085, 2085 (1984) (per curiam).  The validity of the warrant is considered based on the totality of the circumstances.  See Brundidge, 170 F.3d at 1352.

When the challenge raised to a search warrant is an alleged lack of nexus between the place searched and the items being sought and involves the residence of a defendant, the Eleventh Circuit Court of Appeals has stated that "the affidavit must supply the authorizing magistrate with a reasonable basis for concluding that Defendant might keep evidence of his crimes at his home, i.e., a 'safe yet accessible place.'"  United States v. Kapordelis, 569 F.3d 1291, 1310 (11th Cir. 2009) (quoting

AO 72A
(Rev.8/82)

United States v. Feliz, 182 F.3d 82, 87-88 (1st Cir. 1999)).  The court in Kapordelis

further stated in connection with searching a suspect's home:

> "The justification for allowing a search of a person's residence when that
> person is suspected of criminal activity is the common-sense realization
> that one tends to conceal fruits and instrumentalities of a crime in a place
> to which easy access may be had and in which privacy is nevertheless
> maintained.  In normal situations, few places are more convenient than
> one's residence for use in planning and hiding fruits of a crime."

Id. (quoting United States v. Green, 634 F.2d 222, 226 (5th Cir. Unit B 1981)); see also

United States v. Alexander, 574 F.3d 484, 490 (8th Cir. 2009) ("'Judges may draw

reasonable inferences from the totality of the circumstances in determining whether

probable cause exists to issue a warrant. . . .'") (citation omitted); United States v.

Wiley, 475 F.3d 908, 916 (7th Cir. 2007) ("'. . . issuing judges are entitled to draw

reasonable inferences about where evidence is likely to be found given the nature of

the evidence and the type of offense'") (citation omitted).  Therefore, while the

affidavit must establish a link between the defendant and the residence to be searched,

as well as between the residence and criminal activity, "[t]here need not be an

allegation that the illegal activity occurred at the location to be searched . . . ."

Kapordelis, 569 F.3d at 1310 (citing, e.g., United States v. Anton, 546 F.3d 1355, 1358

(11th Cir. 2008) (holding that evidence establishing that a defendant possesses

16

contraband of the type that would normally be expected to be hidden in a residence will support the search); United States v. Jenkins, 901 F.3d 1075, 1080-81 (11th Cir. 1990) (finding that nexus between the items to be seized and a defendant's residence can be established circumstantially if the contraband is capable of being hidden therein)).

The nature of the criminal conduct in which Defendant was engaged, purchasing firearms for the unlawful export to Trinidad and involving utilizing third parties to make the unlawful firearms purchases and to assist with the unlawful export - all of which required record keeping and communication and coordination with his co-conspirators nearby and in Trinidad - is of the type that it is reasonable to infer that evidence of this activity would be maintained by Defendant in a readily accessible place, that is, his residence. And, due to the need to communicate with individuals in Trinidad, the Magistrate Judge quite reasonably concluded that Defendant did so electronically - either utilizing a telephone or computer. Furthermore, along with drawing his own reasonable inferences regarding where evidence of Defendant's firearms trafficking and export would be stored, Magistrate Judge Anand was entitled to rely on Affiant's opinion as to the probable location of this evidence. Affiant, based on his training and experience, opined that individuals engaged in the type of criminal

17

conduct in this case maintained records, ledgers and other documents, such as, money orders and receipts, both on paper and by use of cellular telephones and computers, and that - with respect to the export of firearms - individuals are required by law to maintain records.  [Affidavit ¶¶ 1-4, 8-13].  See United States v. Leach, 498 Fed. Appx. 915, 917 (11th Cir. 2012) ("Opinions and conclusions of experienced agents regarding a set of facts are a factor in the probable cause equation."); United States v. Williams, 544 F.3d 683, 686-87 (6th Cir. 2008) (noting that courts "may afford 'considerable weight to the conclusion of experienced law enforcement officers regarding where evidence of a crime is likely to be found'" and finding that "the warrant application demonstrated 'continuing and related illegal firearm activity,' from which the issuing judge could infer that evidence pertaining to the handguns would be found in [the defendant's] residence") (citations omitted); United States v. Umansky, 291 Fed. Appx. 227, 228 n.1 (11th Cir. 2008) (noting that in reviewing the sufficiency of probable cause for a search warrant, the appellate court "give[s] due weight to the inferences that the judge and law enforcement officers drew from the facts"); Anton, 546 F.3d at 1358 (based on the information in the affidavit for a search warrant for the defendant's residence, including that agents had observed the defendant, along with his trailer, at gun shows and had observed the defendant in possession of firearms at

18

the gun shows, that an informant had advised that the defendant possessed over 300 guns, and that, based on the agent's experience, convicted felons and firearms dealers typically store contraband items on their property, the court found that the search warrant was supported by probable cause); and see Malone v. United States, 2013 WL 3929961, at *13 (N.D. Ala. July 29, 2013) (discussing reasonable suspicion to support seizure of U.S. mail, the court stated that officers must be permitted "to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person") (quoting United States v. Arvizu, 122 S. Ct. 744, 750 (2002)) (internal quotation marks omitted).

The affidavit for the search warrant established a nexus between Defendant's criminal activity and his residence.  And, even if the affidavit did not establish probable cause, the good faith exception applies in this case.  In United States v. Leon, 104 S. Ct. 3405 (1984), and Massachusetts v. Sheppard, 104 S. Ct. 3424 (1984), the Supreme Court established a good faith exception to the exclusionary rule where officers placed reasonably objective reliance on a search warrant later determined to be defective.  In United States v. Accardo, 749 F.2d 1477 (11th Cir. 1985), the Eleventh Circuit Court of Appeals discussed the good faith exception established by the

19

Supreme Court.  With the exception of cases "where the issuing magistrate wholly abandoned his judicial role[,]" or where "a warrant [is] based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable[,]'" or where "a warrant may be so facially deficient – i.e., in failing to particularize the place to be searched or the things to be seized – that the executing officers cannot reasonably presume it to be valid[,]" the good faith exception applies. Id. at 1480 & n.4 (citations omitted).  The good faith exception "require[s] suppression 'only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause.'"[7] Id. at 1480 (quoting Leon, 104 S. Ct. at 3422).  In making this decision, the totality of the circumstances surrounding issuance of the search warrant may be considered.  Id. at 1481.

The search warrant for Defendant's residence was not "based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable[.]'" Leon, 104 S. Ct. at 3421 (citation omitted).  The court notes that the affidavit supporting the search warrant was not a "'bare-bone' statement of nothing

---

[7]As the court determined *supra*, the affiant did not intentionally or with deliberate recklessness omit material information from the affidavit.

20

more than conclusory allegations" which the Supreme Court in <u>Leon</u> found indicative of warrants falling within the third exception to the good faith doctrine.  <u>See</u> <u>United States v. Glinton</u>, 154 F.3d 1245, 1257 (11th Cir. 1998).  The affidavit included details about Affiant's training and experience, about information obtained during several interviews of Defendant and his associates and about firearm purchases and shipments to Trinidad.  This affidavit presented much more than conclusory, "bare-bone" assertions for consideration by the issuing judge.  The affidavit provided factual details for the issuing judge to consider and evaluate.  The law enforcement officers were, therefore, entitled to rely upon that evaluation and determination that "given all the circumstances set forth in the affidavit before [the judge], there [was] a fair probability that contraband or evidence of a crime [would] be found in a particular place."  <u>Gates</u>, 103 S. Ct. at 2332.

Additionally, the items seized during execution of the warrant either fell within the scope of the Magistrate Judge's authorization or within the plain view exception. "The Fourth Amendment provides, in relevant part, 'no Warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.'"  <u>United States v. Evans</u>, 469 F. Supp. 2d 893, 896 (D. Mt. 2007) (quoting U.S. Const. amend. IV); <u>United States v.</u>

21

Wuagneux, 683 F.2d 1343, 1348 (11th Cir. 1982) ("The Fourth Amendment requires that warrants 'particularly describ[e] the place to be searched, and the persons or things to be seized.'") (quoting U.S. Const. amend. IV).

> The Eleventh Circuit Court of Appeals has stated that:
>
> If a search exceeds the scope of terms of a warrant, any subsequent seizure is unconstitutional.  However, a search may be extensive as reasonably necessary as required to locate the items described in the warrant, and is generally "not limited by the possibility that separate acts of entry or opening may be required to complete the search."

United States v. Jackson, 120 F.3d 1226, 1228 (11th Cir. 1997) (quoting United States v. Martinez, 949 F.2d 1117, 1120 (11th Cir. 1992)).  "The crucial inquiry is always 'whether the search and seizures were reasonable under all the circumstances.'" United States v. Schandl, 947 F.2d 462, 465 (11th Cir. 1991) (quoting Wuagneux, 683 F.2d at 1352).  This includes consideration of whether the agents executing the warrant reasonably interpreted the list of property to be seized to include items that may not be specifically listed in the warrant.  See United States v. Hill, 19 F.3d 984, 987 (5th Cir. 1994) ("In identifying the property to be seized, the agents are 'required to interpret the warrant,' but are 'not obliged to interpret it narrowly.'") (citation omitted).

Seizure of items beyond the scope of the warrant does not automatically invalidate the search.  In <u>United States v. Khanani</u>, 502 F.3d 1282 (11th Cir. 2007), the Eleventh Circuit Court of Appeals summarized the Court's prior holdings:

> Total suppression of all items seized, including items within a warrant's scope, is not appropriate unless the executing officers' conduct "exceeded any reasonable interpretation of the warrant's provisions." . . . "[A]bsent a 'flagrant disregard' of the terms of a warrant, the seizure of items outside the scope of the warrant will not affect admissibility of items properly seized," . . . or "constitute reversible error on direct appeal from the conviction."

<u>Id.</u> at 1289 (quoting <u>Wuagneux</u>, 683 F.2d at 1354; <u>United States v. Lambert</u>, 887 F.2d 1568, 1572 (11th Cir. 1989)); <u>see also</u> <u>Schandl</u>, 947 F.2d at 465.  And if an exception to the warrant requirement is established, items exceeding the scope of a lawful warrant may be seized.  One such exception is the plain view doctrine.  <u>See</u> <u>Horton v. California</u>, 110 S. Ct. 2301, 2306 (1990); <u>United States v. Hamie</u>, 165 F.3d 80, 83 (1st Cir. 1999) ("As the Supreme Court has stated, [a]n example of the applicability of the plain view doctrine is the situation in which the police have a warrant to search a given area for specified objects, and in the course of the search come across some other article of incriminating character.") (quoting <u>Coolidge v. New Hampshire</u>, 91 S. Ct. 2022, 2037-38 (1971)) (internal quotation marks omitted).

23

"An officer may seize evidence that is in plain view despite the failure to obtain a search warrant if two elements are satisfied: (1) lawful access to the object seized, and, (2) the incriminating nature of the object seized is immediately apparent." United States v. Hromada, 49 F.3d 685, 690 n.11 (11th Cir. 1995) (citing Horton, 110 S. Ct. at 2308); and see United States v. Folk, 754 F.3d 905, 911 (11th Cir. 2014) (same); United States v. Susini, 261 Fed. Appx. 270, 273 (11th Cir. 2008) ("[I]t is well-settled that 'objects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced into evidence.'") (quoting Harris v. United States, 88 S. Ct. 992, 993 (1968)); United States v. Simpson, 259 Fed. Appx. 164, 165-68 (11th Cir. 2007) (upholding plain view seizure of a backpack containing marijuana when officers were inside the residence conducting consent search to look specifically for weapons and injured persons).

"The incriminating nature of an item is 'immediately apparent' if the officers have 'probable cause' to believe that the item is either evidence of a crime or contraband." United States v. Buchanan, 70 F.3d 818, 826 (5th Cir. 1995) (citing Arizona v. Hicks, 107 S. Ct. 1149, 1153 (1987)); and see Susini, 261 Fed. Appx. at 273 (same). "Probable cause does not require certainty. . . . In reviewing probable cause determinations, [a court] must consider the totality of the circumstances-including the

24

officers' training and experience as well as their knowledge of the situation at hand." Buchanan, 70 F.3d at 826; see also Craig v. Singletary, 127 F.3d 1030, 1042 (11th Cir. 1997) ("Because 'sufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment,' . . . 'probable cause itself is a doctrine of reasonable probability and not certainty[.]'") (citation omitted). "[A] police officer may draw inferences based on his own training and experience in deciding whether probable cause exists . . . ." United States v. Reeves, 604 Fed. Appx. 823, 827 (11th Cir. 2015); and see United States v. Edwards, 2010 WL 5184784, at *9 (N.D. Ga. October 13, 2010) (in finding that documents containing names and telephone numbers were properly seized pursuant to the plain view doctrine, the court noted that "[i]n considering whether probable cause exists, the observations and experiences of the law enforcement officers working a case must be weighed as a part of the totality of the circumstances that might create probable cause"), adopted by United States v. Jones, 2010 WL 5276983 (N.D. Ga. December 15, 2010).

And in conducting a search pursuant to a warrant, as noted, searching officers "ha[ve] the right to conduct a search as 'extensive as reasonably required to locate the items described in the warrant[,]'" Folk, 754 F.3d at 911 (quoting Jackson, 120 F.3d at 1228), and are "permitted 'to break open locked containers which may contain the

25

objects of the search[,]'" Id. (quoting Martinez, 949 F.2d at 1120).  And see United States v. Ross, 102 S. Ct. 2157, 2170-71 (1982) ("A lawful search of fixed premises generally extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search.").

Many of the items that Defendant identified as being seized outside the scope of the warrant, such as, identification documents evidencing indicia of occupancy (including the driver's license bearing Defendant's photograph, his passports and social security card), the documents reflecting the purchase, sale or transfer of firearms (such as, money orders and receipts and the ledger), and the smart phone and laptop computer, fall within the scope of the warrant.  (Gov't Exh. 62).  The agents identified the items as such and seized the items, at least in part, for that reason.  (Tr. at 17-18, 26-27, 28-30, 33-34, 36-37, 61-64, 71-74, 76).  The remaining items, such as, the credit card reader (skimmer), credit card embosser and numerous credit cards, both in Defendant's name and the names of third parties, were seized based on the plain view exception.

As soon as the agents lawfully entered Defendant's apartment to execute the arrest and search warrants, they observed the laptop computer connected to the credit

card reader and a number of credit cards on the couch. (Tr. at 16, 52-53). Agent Gray testified that he believed that Defendant was "doing some type of credit card fraud" and confirmed his suspicions with ATF Agent Jon Jenkins, formerly an agent with the Secret Service, who stated, "[T]his is going to be credit card fraud. I've dealt with this numerous times."[8] (Tr. at 16-18, 43; Gov't Exhs. 2, 3 and 4). Likewise, the credit card embosser, as identified by Agent Jenkins, was used to make credit cards and constituted evidence of fraudulent conduct. (Tr. at 34, 56, 62; Gov't Exh. 65). Along with these items, the agents found a number of credit cards. In the kitchen, Agent Dorman found a bag and searched the contents, based on the authority in the search warrant to search for documents indicating indicia of occupancy and evidencing shipping and transporting firearms. Although he did not know what was in the bag, he stated that the bag was large enough to contain these items. (Tr. at 54-54, 64-66; Gov't Exhs. 63 and 64). The agent was authorized to open any containers that might hold the items subject to seizure. See Ross, 102 S. Ct. at 2170-71; Folk, 754 F.3d at 911; Jackson, 120 F.3d at 1228. And while doing so, pursuant to the plain view doctrine, the agent was authorized to seize evidence of criminal conduct, even if not identified

---

[8]Agent Dorman likewise stated that the laptop computer connected to the skimmer was evidence of fraud and that he confirmed his belief with Agent Jenkins. (Tr. at 52-53).

in the warrant.  See Horton, 110 S. Ct. at 2306; Susini, 261 Fed. Appx. at 273; Buchanan, 70 F.3d at 826.  In the bag, Agent Dorman found a number of credit cards, some in Defendant's name, which he believed established both indicia of ownership of the bag and occupancy and constituted evidence of fraud, especially in light of the other items found in the residence.  (Tr. at 55, 62, 64-65).  Based on their observations, the court finds that the agents executing the warrant were authorized to seize the credit card reader and embosser and credit cards based on the plain view doctrine.  See Reeves, 604 Fed. Appx. at 827-28; United States v. Dabrezil, 603 Fed. Appx. 756, 759-60 (11th Cir. 2015); Susini, 261 Fed. Appx. at 274.

For these reasons, the court recommends that Defendant's motion [Doc. 50] to suppress evidence seized as a result of execution of the federal search warrant be denied.

**b.    Consent Search**

Defendant also challenges the consent search of his Nissan Altima contending that, based on the circumstances, his consent was coerced.  [Doc. 56].  In support of his motion, Defendant points to the following facts, including, the time of day (6:00 a.m.) when the search took place, that the agents breached the door, that he was attired in his underwear, the number of agents (twelve to fifteen) attired in tactical gear and

28

armed, the location of his consent (the bathroom), that he was in custody and handcuffed, and that he was not advised of his <u>Miranda</u> rights before consenting.  [Doc. 86 at 2-5].  The Government asserts that the totality of the circumstances establish that Defendant freely and voluntarily consented to the search.

"It has been long recognized that police officers, possessing neither reasonable suspicion nor probable cause, may nonetheless search [a home] without a warrant so long as they first obtain the voluntary consent [for the search]."  <u>United States v. Blake</u>, 888 F.2d 795, 798 (11th Cir. 1989) (citing <u>Schneckloth v. Bustamonte</u>, 93 S. Ct. 2041 (1973)).  "Whether a suspect voluntarily gave consent to a search is a question of fact to be determined by the totality of the circumstances."  <u>Id.</u> at 798 (citing <u>Schneckloth</u>, 93 S. Ct. at 2059); <u>see also</u> <u>United States v. Nuyens</u>, 17 F. Supp. 2d 1303, 1306 (M.D. Fla. 1998) ("Voluntariness of consent is a question of fact, and the Court must look to the totality of the circumstances.").  "The government bears the burden of proving both the existence of consent and that the consent was not a function of acquiescence to a claim of lawful authority but rather was given freely and voluntarily."  <u>Blake</u>, 888 F.2d at 798 (citing <u>United States v. Massell</u>, 823 F.2d  1503, 1507 (11th Cir. 1987)); <u>see also</u> <u>United States v. Purcell</u>, 236 F.3d 1274, 1281 (11th Cir. 2001) ("A consensual search

is constitutional if it is voluntary; if it is the product of an 'essentially free and unconstrained choice.'") (citation omitted).

As the Eleventh Circuit Court of Appeals affirmed in United States v. Acosta, 363 F.3d 1141 (11th Cir. 2004), "determining whether consent was 'voluntary is not susceptible to neat talismanic definitions; rather, the inquiry must be conducted on a case-by-case analysis.'" Id. at 1151 (quoting Blake, 888 F.2d at 798). In conducting this case-by-case analysis, factors considered by courts in assessing voluntariness include, but are not limited to: "'voluntariness of the defendant's custodial status, the presence of coercive police procedure, the extent and level of the defendant's cooperation with police, the defendant's awareness of his right to refuse to consent to the search, the defendant's education and intelligence, and, significantly, the defendant's belief that no incriminating evidence will be found.'" Blake, 888 F.2d at 798 (citations omitted); see also Purcell, 236 F.3d at 1281 (same).

However, "the government need not establish [a defendant's] knowledge of the right to refuse consent 'as the *sine qua non* of effective consent.'" United States v. Zapata, 180 F.3d 1237, 1241 (11th Cir. 1999) (quoting Ohio v. Robinette, 117 S. Ct. 417, 421 (1996)); accord United States v. Brown, 223 Fed. Appx. 875, 880 (11th Cir. 2007) ("the government is not required to prove that the defendant knew he had the

AO 72A
(Rev.8/82)

right to refuse consent, and a defendant's lack of knowledge of this right is not dispositive, but is just one factor to consider in evaluating the totality of the circumstances"); United States v. Pineiro, 389 F.3d 1359, 1366 n.4 (11th Cir. 2005) ("To the extent Pineiro suggests that the police were required to be more specific in advising him of his rights, and were required to tell him he had a right to refuse consent, this Court has squarely rejected this argument."). And, contrasting the test for the waiver of "rights that protect a fair criminal trial and the rights guaranteed under the Fourth Amendment[,]" Schneckloth, 93 S. Ct. at 2055, the Supreme Court explained that, while a consent to search must be voluntary, it need not be "'an intentional relinquishment or abandonment of a known right or privilege[,]'" that is, knowing and intelligent. Id. at 2055-56 (citation omitted); see also Tukes v. Dugger, 911 F.2d 508, 516 (11th Cir. 1990) (same). "'[T]he absence of intimidation, threats, abuse (physical or psychological), or other coercion is a circumstance weighing in favor of up-holding what appears to be a voluntary consent.'" United States v. Alim, 256 Fed. Appx. 236, 239 (11th Cir. 2007) (quoting United States v. Jones, 475 F.2d 723, 730 (5th Cir. 1973)).

The facts presented at the evidentiary hearing establish that Defendant's consent to search was voluntary.  On August 3, 2016, at 6:00 a.m., Agent Gray and

approximately twelve to fifteen other agents arrived at 352B Asbury Commons, Defendant's residence, to execute the federal arrest warrant for Defendant and the search warrant for the residence.  (Tr. at 8-10, 13, 48-49).  He, and the other agents, were attired in tactical gear and carried firearms.  (Tr. at 13, 39-40).  At approximately 6:03 a.m., Agent Gray knocked on the door to the residence and shouted, "police with a search warrant, open the door" - repeating himself when no one answered.  (Tr. at 14).  The door was then forced open due to Defendant's failure to respond.  (Tr. at 14).  When the agents entered the residence, they observed Defendant, dressed in his underwear, standing in the living room hallway.  (Tr. at 14-15, 51; Gov't Exh. 1).  Defendant obeyed commands to raise his hands and to advance slowly; he was then handcuffed.  (Tr. at 15).  In order to secure the residence, Defendant was briefly taken outside while the security sweep of the residence was conducted.  However, Defendant was then returned inside the residence and allowed to dress.  The agents relocated to the bathroom with Defendant because it was the only room with a working light.  Defendant was seated on a chair brought into the room.  (Tr. at 15-16, 19-20, 39; Gov't Exh. 5).  By this time, the situation in the apartment had normalized.

Agents Gray and Lienwand spoke to Defendant, first advising him of the agents' identity and that he had been indicted and then completing the Marshal's Booking

Form.  (Tr. at 19-21, 38, 39).  Agent Gray asked Defendant if he minded the agents

searching his vehicle, a Nissan Altima, that Defendant had advised was parked nearby.

(Tr. at 23-24; Gov't Exh. 6).  After Defendant verbally responded in the affirmative

and after filling out information on the form, the agent presented a consent to search

form to Defendant.  (Tr. at 23-25, 38; Gov't Exhs. 6 and 7).  The form provides:

> I understand that I have right to refuse to give my consent to a search and
> may demand that a search warrant be obtained prior to any search of the
> person or property described below.
>
> I understand that any contraband or evidence of a crime found during the
> search can be seized and used against me in any court of law or other
> proceeding.
>
> I understand that I may consult with an attorney before or during the
> search.
>
> I understand that I may withdraw my consent to this search at any time
> prior to the search's termination.
>
> This consent to search has been given voluntarily without promises,
> threats, coercion or force of any kind whatsoever.
>
> I have read the above statement of rights, understand these rights, and
> hereby authorize agents of the Bureau of Alcohol, Tobacco, Firearms and
> Explosives to conduct a complete search of the property described below.

(Tr. at 24-25; Gov't Exh. 7).  The form fully advised Defendant of his rights and even

that he could consult with an attorney before any search.  Defendant, who was then,

33

and thereafter remained, un-handcuffed, executed the form. (Tr. at 25, 37, 40). Agent Gray testified that nothing indicated that Defendant's consent was involuntary or that he did not understand the form. He did not withdraw his consent. The only two agents around Defendant at the time were not "looming over" Defendant, did not threaten Defendant, did not make promises to Defendant and did not yell at Defendant. Their weapons were not drawn. (Tr. at 26, 39, 42). The audio recording of the interview substantiates the agent's recounting of these events and supports a finding that Defendant was not forced to consent to the search.[9]

The fact that Defendant was being detained, in fact, that he was under arrest, "does not necessarily vitiate [his] valid consent to search." United States v. Smith, 199 Fed. Appx. 759, 763 (11th Cir. 2006); and see United States v. Witten, 649 Fed. Appx. 880, 887 (11th Cir. 2016) ("That Witten was in police custody at the time he consented to the search does not render the consent involuntary."). Arrest situations involving greater demonstrations of force and physical restraint of a suspect have resulted in a finding that consent to search was not coerced. See, e.g., United States v. Kimoana,

---

[9]Additional indicia of the voluntariness of Defendant's consent to search is found in his subsequent assertion of his Fifth Amendment right to remain silent. Defendant apparently was not so intimidated by the events of August 3 that he believed that he could not invoke his Miranda rights. (Tr. at 21, 40-41).

AO 72A
(Rev.8/82)

383 F.3d 1215, 1225-26 (10th Cir. 2004) (although "officers entered the motel room with guns drawn, raising their voices at the occupants and ordering them to put their hands where the officers could see them[,]" the trial court found that "[a]fter performing a pat down, the officers put their weapons back in their holsters, the atmosphere was described as 'calm,' and then [the officer] 'immediately' asked [the defendant] for consent to search the room[;]" therefore, when the consent to search was obtained, the situation had calmed down and no show of force was being exhibited); United States v. Taylor, 31 F.3d 459, 463-64 (7th Cir. 1994) ("The record shows that the initial melee of agents, badges and weapons, necessary to protect the safety of the agents . . ., dissipated only seconds after it had begun and that all was routine once the premises had been secured.  Though certainly unpleasant, there is nothing so inherently coercive about such tactics, commonly used where a danger to life or limb is perceived by law enforcement agents, to render subsequent cooperation involuntary."); United States v. Hidalgo, 7 F.3d 1566, 1570-71 (11th Cir. 1993) (facts that the defendant "was arrested by SWAT team members who broke into his home in the early morning, woke him, and forced him to the ground at gunpoint" did not establish consent to search was involuntary, even though consent was given after invocation of Miranda rights); United States v. Garcia, 890 F.2d 355, 360-62 (11th Cir. 1989) (the court found voluntary a

35

consent to search which was given after the defendant was arrested by numerous officers, patted down for weapons and a protective sweep of his house was conducted and after he was seated in his living room in handcuffs, given his Miranda rights, and the officers had refused to accept a limited consent).

Contrasted with the facts in other cases which courts have found did not invalidate the voluntariness of a consent to search, nothing in the events surrounding Defendant Alfred's consent to search results in a finding that his consent was merely acquiescence to an official show of authority.  In United States v. Strickland, 245 F.3d 368 (4th Cir. 2001), the Fourth Circuit Court of Appeals refused to find that a consent to search was involuntary.  In Strickland, officers arrived at the defendant's residence at 6:30 a.m. and unsuccessfully attempted to wake him by pounding on the door and the side of the trailer.  They, therefore, broke open the front door, entered, and handcuffed both the defendant's wife and the defendant, who at the time was dressed only in his underwear.[10]  Both were seated, handcuffed, in the living room - the defendant still in his underwear.  The agents asked if there were any weapons in the residence or any more marijuana, the agents having seen the latter on a kitchen counter.

---

[10]The defendant's wife was advised that she was not under arrest but only handcuffed for officer safety.  Id. at 382-83.

The defendant pointed out the location of a firearm and responded negatively to the question about additional marijuana. The agents then asked for consent to search the residence, and both the defendant and his wife consented. Id. at 382-83. The court upheld the consent finding that the officers did not use any force other than that necessary to effect the entry into the residence and to arrest the defendant and that no facts indicated that the defendant was coerced into consenting to the search. Id. See also United States v. Guiterrez, 92 F.3d 468, 470-71 (7th Cir. 1996) (the circumstances surrounding the consent, including approximately a dozen federal agents entering the premises with weapons drawn, handcuffing the individuals present and ordering them up against the wall, including the defendant, and the fear of being arrested, was not so inherently coercive to render the consent involuntary); United States v. Espinosa-Orlando, 704 F.2d 507, 512-13 (11th Cir. 1983) (the court found that the consent to search was voluntary although the defendant had been detained and placed on the ground by armed officers and although one of the officers still had his weapon drawn pointed away from the defendant at the ground, because there was no abusive language used and no threats, because the request was made in a conversational tone, and because the defendant was not handcuffed or removed from the scene of the stop and detention).

37

For these reasons, the court recommends that Defendant's motion [Doc. 56] to suppress the fruits of the consent search of his vehicle be denied.

## III.   Conclusion

For the foregoing reasons and cited authority, the court **RECOMMENDS** that Defendant Alfred's motions [Docs. 50 and 56] to suppress be **DENIED** and that Defendant's unopposed motion [Doc. 78] for severance of Counts 19 and 20 be **GRANTED**.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, declared Ready for Trial.

**SO ORDERED AND RECOMMENDED** this 18th day of July, 2017.

JANET F. KING
UNITED STATES MAGISTRATE JUDGE

38