# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

UNITED STATES OF AMERICA,

v.                                          1:16-cr-245-WSD-JFK-1

ERROL ALFRED,

Defendant.

## OPINION AND ORDER

This matter is before the Court on Defendant Errol Alfred's ("Alfred")

Objections [91] to Magistrate Judge Janet F. King's Report and

Recommendation [88] ("R&R").  The R&R recommends that Alfred's Motion to

Suppress Search of 352B Asbury Commons, Atlanta, Georgia [50]

("Residence Suppression Motion") and Motion to Suppress Search of Defendant's

Car and the Seizure of Items in the Car [56] ("Vehicle Suppression Motion")

(together, "Suppression Motions") be denied, and that Alfred's Motion to

Sever [78] ("Severance Motion") be granted.

## I. BACKGROUND[1]

### A. The Initial Indictment

On June 29, 2016, a grand jury returned an Indictment [1] charging Defendants Jordan Dunham ("Dunham") and Alfred with eight counts, and Defendants Kerry Fernandez ("Fernandez") and Alfred with one count, of aiding and abetting each other in causing a false statement to be made during the purchase of a firearm, in violation of 18 U.S.C. §§ 922(a)(6), 924(a)(2), 2. The Indictment also charged Alfred, aided and abetted by Fernandez and Dunham, with six counts of causing a false statement to be made during the purchase of a firearm, in violation of 18 U.S.C. §§ 922(a)(6), 924(a)(2), 2. The Indictment was filed under seal, and warrants were issued for Defendants' arrest.

### B. The Search Warrant

On August 1, 2016, the Government presented Magistrate Judge Justin A. Anand with its application ("Application") and supporting affidavit ("Affidavit") for a warrant to search Alfred's residence—located at 352B Asbury Commons,

---

[1] The facts, stated in this Order, are taken from the R&R and the record. The parties have not objected to any specific facts in the R&R, and the Court finds no plain error in them. The Court thus adopts the facts set out in the R&R. See Garvey v. Vaughn, 993 F.2d 776, 779 n.9 (11th Cir. 1993).

Atlanta, Georgia—for evidence of violations of 18 U.S.C. §§ 922(a)(6), 544.[2]

([50.2]).  The Affidavit, which was fifteen pages long, contained the sworn

statements of Special Agent Jonathan P. Gray of the Bureau of Alcohol, Tobacco,

Firearms, and Explosives ("ATF").  The Affidavit stated that Agent Gray

graduated from local and federal law enforcement academies, that he previously

worked as a police officer, that he had worked for ATF since 2001, that he

previously participated in "numerous investigations, search warrants, and arrest

warrants" involving violations of sections 922(a)(6) and 554, that during these

investigations he seized firearms and items used to facilitate firearms trafficking,

that he had "debrief[ed] defendants, co-conspirators, witnesses, and informants"

about the unlawful purchase, sale and distribution of firearms, and that several

defendants, in prior cases, told him that they used "straw" purchasers to obtain the

firearms involved in their offenses.  (Affidavit ¶¶ 1-4).

The Affidavit asserted there was probable cause to believe that Alfred's

home contained "evidence, fruits, and instrumentalities of the scheme to straw

purchase firearms and illegally smuggle them to Trinidad in violation

---

[2]     Sections 922(a)(6) prohibits the making of false statements in connection
with the purchase of a firearm.  Section 544 provides penalties for the unlawful
exportation of merchandise that is "relanded at any place in the United States."
18 U.S.C. § 544.

of . . . Sections 922(a)(6) and 554." (Affidavit ¶ 7). Agent Gray, in the Affidavit, provided information about common firearms trafficking practices, including that traffickers often (1) maintain notes, ledgers, journals, and other documents to track their firearm transactions and financial proceeds, (2) use cell phones, computers, and other electronic media devices to coordinate their firearm transactions, and (3) display, on social media or in their residence, photographs depicting the defendant in possession of the firearms. (Affidavit ¶¶ 8-11). Agent Gray also testified that individuals who engage in unlawful exporting often maintain online records and "numerous files on their computers," and "rely heavily on email and other online instrumentalities to conduct their illegal transactions." (Affidavit ¶ 12).

The Affidavit described the Indictment against Defendants, and explained that, from August 2013 through September 2014, Alfred used Fernandez, Dunham, and Amadee Jean-Baptiste, aka "Haiti" ("Baptiste"), to purchase 36 firearms on his behalf. (Affidavit at 5-8). The Affidavit described several interviews that federal law enforcement officials conducted pursuant to their investigation into Defendants' firearms offenses. Specifically, the Affidavit stated that, on October 30, 2014, Alfred told law enforcement officials that he was born in Trinidad, that he became a naturalized citizen of the United States in 2012, that he

moved to his current residence in May 2014, and that he previously lived with his girlfriend, Defendant Dunham. (Affidavit at 8). Alfred also told officials that he and Dunham purchased several firearms during the last year but that the firearms were stolen from his home or from Dunham's car. When pressed for details, Alfred began to shake and stammer and repeatedly contradicted his story. (Affidavit at 8-9). Alfred stated that his most recent firearms purchase was in April 2014, became "very nervous," said that Dunham was arrested the night before the interview for assaulting him, and asked what Dunham had told the officials. (Affidavit at 9).

The Affidavit stated that, on November 26, 2014, Dunham told law enforcement officials that she purchased firearms "on seven different occasions" with money she received from Alfred, that Alfred told her what firearms to purchase, that she gave Alfred the firearms after she bought them, and that she did not know what he did with them. (Affidavit at 9). Dunham stated that she and Alfred sent "clothing and household goods" to Trinidad, that she was with Baptiste when he purchased firearms for Alfred, that she loaned money to Baptiste so he could purchase the firearms, and that Alfred later took possession of the firearms. (Affidavit at 10).

The Affidavit stated that, on November 12, 2014, Baptiste told law enforcement officials that he purchased several firearms for Alfred, that Alfred gave him money to pay for the firearms, and that Baptiste gave the firearms to Alfred. (Affidavit at 10-11). The Affdiavit further stated that, on December 2, 2014, law enforcement officials obtained records of packages shipped by Alfred and Dunham from Atlanta to Trinidad. (Affidavit at 11). Officials also obtained records showing that, in late 2013, Defendant Fernandez shipped a package from Atlanta to Trinidad. Ferndanez listed his sender address as the apartment complex in which Dunham and Alfred lived. (Affidavit at 12). On December 9, 2014, Fernandez told officials that he had known Alfred for more than twenty years, that they grew up together in Trinidad, that he drove Baptiste to purchase a firearm in the summer of 2014, and that he shipped clothing and food to Trinidad on behalf of Alfred. (Affidavit at 12).

The Affidavit stated that, on October 6, 2015, Baptiste told law enforcement officials that, in the summer of 2014, Baptiste agreed to send "food" to Trinidad on Alfred's behalf, that the suitcases purportedly containing the food were "very heavy" and appeared to contain "coffee containers wrapped in saran wrap," and that Alfred later picked the suitcases back up and said, without explanation, that he would ship them to Trinidad himself. (Affidavit at 13). Baptiste stated that,

in July or August 2014, Alfred asked him to ship firearms to Trinidad, that Baptiste refused, that Alfred said Dunham previously shipped firearms on Alfred's behalf, that Alfred later shipped the firearms himself, and that Alfred said he was "trying to send guns back home."  (Affidavit at 13).  Baptiste stated that, after law enforcement officials began conducting interviews as part of their investigation, Fernandez advised Baptiste to tell officials he "lost" the firearms he purchased. (Affidavit at 14).  Fernandez bragged that he told officials he "only shipped food to Trinidad," and, while laughing, said the shipments actually contained firearms hidden in the food.  (Affidavit at 14).  Alfred told Baptiste that "he was sending firearms to Trinidad[,] that he had been doing it 'for years,'" and that Baptiste should not worry.  (Affidavit at 14).  Alfred and Fernandez told Baptiste that they had a cousin who worked for the Trinidad government, and that the cousin picked up the packages containing the firearms and sold them for $2,000 each.  (Affidavit at 14).

Finally, the Affidavit stated that Alfred's vehicle was registered at 352B Asbury Commons, Atlanta, Georgia, and that the vehicle's registration was renewed on March 29, 2016.  (Affidavit at 14).  The Affidavit stated that law enforcement officials confirmed that Alfred signed a lease for the residence for the May 2016, through May 2017, time period.  (Affidavit at 14-15).

The Government's Application for the search warrant identified the following items sought to be seized in Alfred's apartment:

a. Any/all firearms and ammunition.

b. Any/all ledgers, paperwork, receipts, manuals, or documents regarding the theft/purchase/sale/transfer of firearms and ammunition.

c. Any/all containers, boxes, or packaging bearing firearms or ammunition information.

d. Any/all applications or membership cards associated with firearms related clubs or shooting ranges.

e. Any/all photographs, targets, or spent cartridge casings consistent with shooting or firearms related activity.

f. Any/all paperwork, identifications, or documents indicia of ownership or occupancy at 352B Asbury Commons, Atlanta, GA 30338.

g. Any/all cell phones or electronic media devices used for the communication/coordination of firearms sales/distribution.

h. Any/all export documents, receipts, Air Waybills, and related paperwork which indicate goods being shipped from the United States to foreign countries, to include Trinidad.

([50.2] at 20).

On August 1, 2016, Magistrate Judge Anand found that the Affidavit established probable cause to search Alfred's apartment, granted the

Government's Application, and issued the search warrant requested. ([50.1]).

C.    Execution of the Search Warrant

On August 3, 2016, at 6:00 a.m., Agent Gray and approximately twelve to fifteen other law enforcement officers arrived at Alfred's apartment to arrest Alfred and to execute the search warrant. (Transcript of Evidentiary Hearing before Magistrate Judge Janet F. King (Apr. 26, 2017) [83] ("Tr.") at 8-10, 13, 48-49). The officers, who wore tactical gear and carried firearms, previously had reviewed the list of items to be seized under the search warrant. (Tr. at 10-13, 39-40, 50, 70). At approximately 6:03 a.m., Agent Gray knocked on the door to the residence and repeatedly shouted, "police with a search warrant, open the door." (Tr. at 14). There was no response from inside the apartment, and the officers forced the door open. (Tr. at 14).

When the officers entered the residence, they saw Alfred, dressed in his underwear, standing in the living room hallway. (Tr. at 14-15, 51). When the officers told him to raise his hands, Alfred complied and was handcuffed. (Tr. at 15). He was briefly taken outside while the officers completed their security sweep of the residence. (Tr. at 15-16, 19). After he got dressed, the officers took him into the bathroom, the only room with a working light, and seated him on a

chair brought into the room. (Tr. at 19-20, 39). Agent Gray and Special Agent Lienwand[3] were the only officers in the room with Alfred. (Tr. at 39).

Agents Gray and Lienwand told Alfred he had been indicted, that a warrant for his arrest had been issued, and that he was under arrest. (Tr. at 21). The officers' tone was pleasant, non-threatening and non-coercive. (R&R at 9 n.4). Alfred was calm, cooperative and did not appear to be under stress. (R&R at 9 n.4). Agent Gray completed the Marshal's Booking Form[4] and asked Alfred for permission to search his vehicle, which was parked outside. (Tr. at 20-21, 23-24; [90.1] at 6). Alfred agreed to the search and executed a "Consent to Search" form, which provided:

> I understand that I have a right to refuse to give my consent to a search and may demand that a search warrant be obtained prior to any search of the person or property described below.

---

[3]    Agent Lienwand worked for the Bureau of Industry and Security ("BIS"). (Tr. at 38).

[4]    Alfred asked officers to retrieve his cell phone from his bedroom so he could provide contact information required by the booking form. Agent Lienwand retrieved, and later seized, the phone. (Tr. at 19-20, 26-27, 36, 62-63; [90.1] at 6). Agent Gray testified that the cell phone—and Alfred's laptop, discussed later in this Order—may contain evidence of firearms trafficking, including photographs, checking account information, emails, and other communications with third parties. (Tr. at 36-37). Law enforcement officials subsequently obtained search warrants to examine the contents of the laptop and the cell phone. (Tr. at 42-43).

I understand that any contraband or evidence of a crime found during the search can be seized and used against me in any court of law or other proceeding.

I understand that I may consult with an attorney before or during the search.

I understand that I may withdraw my consent to this search at any time prior to the search's termination.

This consent to search has been given voluntarily without promises, threats, coercion or force of any kind whatsoever.

I have read the above statement of rights, understand these rights, and hereby authorize agents of the Bureau of Alcohol, Tobacco, Firearms and Explosives to conduct a complete search of the property described below.

([90.1] at 7; Tr. at 24-25).

Alfred was not handcuffed when he executed the form and he remained unhandcuffed for the remainder of his interview with the officers. (Tr. at 40). Agent Gray testified that there were no indications that Alfred's consent was involuntary or that he did not understand "what he was doing." (Tr. at 25-26). Alfred did not withdraw his consent or tell the officers to stop searching his car. (Tr. at 26). Agents Gray and Lienwand did not draw their weapons, were not "looming over" Alfred, did not threaten him, did not yell at him, and did not make him any promises. (Tr. at 26, 42). The officers recorded that "miscellaneous documents" were found in Alfred's car. ([90.3] at 6).

The officers saw, on the couch in Alfred's living room, several credit cards, a laptop computer, and a credit card reader (a "skimmer") attached to the laptop by cable. (Tr. at 16, 52-53). Agent Gray believed that Alfred was "doing some type of credit card fraud," and discussed his suspicions with ATF Agent Jon Judkins, who previously worked for the Secret Service. Agent Judkins told him, "this is going to be credit card fraud. I've dealt with this numerous times." (Tr. at 16-18, 43; [90.1] at 2-4). Special Agent Don Dorman, the designated evidence technician for the search warrant, also believed the items were evidence of credit card fraud. (Tr. at 52-53). The officers seized the laptop on the grounds that it was covered by the search warrant and was evidence of fraudulent activity. (Tr. at 17-18, 34, 37, 63; [90.4] at 39). The officers also seized a counterfeit driver's license that bore Alfred's photograph but a different name and address. The license was found in a Bible on the mantel in Alfred's living room. It was seized on the grounds that it was covered by the search warrant—because it indicated occupancy of the apartment—and as evidence of fraudulent activity. (Tr. at 28-30, 63; [90.3] at 1-2; [90.4] at 39). The officers seized several other documents covered by the search warrant, including money order receipts, a ledger, Alfred's social security card, and his Trinidad and United States passports. (Tr. at 30-34, 61, 63-64, 71-74, 76; [90.3] at 9-10; [90.4]).

Agent Dorman saw a bag in the kitchen during his search of Alfred's residence. He did not know what was in the bag but believed it was large enough to contain items covered by the search warrant, including documents evidencing firearm shipments and documents indicating occupancy of the apartment. (Tr. at 54, 64-66). Agent Dorman searched the bag and found several credit cards in it, including some in Alfred's name. Agent Dorman believed the credit cards indicated occupancy of the apartment and ownership of the bag, and constituted evidence of fraud in light of other items found in the residence. (Tr. at 55, 62, 64-65). Officers also seized a credit card embossing machine on the grounds that it was used to make credit cards and was evidence of fraud. (Tr. at 34, 56, 62; [90.3] at 5).

D.     Procedural History

On September 25, 2016, Alfred filed his Residence Suppression Motion, seeking to suppress evidence obtained during execution of the search warrant at his residence. Alfred argues that the search warrant was not supported by probable cause, that the good faith exception to the exclusionary rule does not apply, and that law enforcement officers seized items beyond the scope of the search warrant. On November 4, 2016, Alfred filed his Vehicle Suppression Motion, seeking to

exclude evidence obtained during the search of Alfred's vehicle.  Alfred argues that his consent to the vehicle search was not voluntary.

On March 1, 2017, the grand jury returned a Superseding Indictment [65] charging Defendants with the same counts listed in the initial Indictment (Counts 4-18), and also charging Alfred and Fernandez with one count of conspiracy to smuggle firearms out of the United States, in violation of 18 U.S.C. 371 (Count 1), one count of submitting false or misleading export information, in violation of 13 U.S.C. § 305 (Count 2), and one count of delivering firearms to a common or contract carrier for international shipment without written notice, in violation of 18 U.S.C. § 922(e) (Count 3).  The Superseding Indictment also charges Alfred with one count of access device fraud, in violation of 18 U.S.C. §§ 1029(a)(3), 1029(c)(1)(A)(i), 1029(c)(2) (Count 19), and one count of access device fraud, in violation of 18 U.S.C. §§ 1029(a)(4), 1029(c)(1)(A)(ii), 1029(c)(2) (Count 20).

On March 22, 2017, Alfred filed his Severance Motion, seeking to sever Counts 19 and 20 from the other counts in the Superseding Indictment.  On April 26, 2017, the Magistrate Judge held an evidentiary hearing on Alfred's motions.  ([83]).  The parties later filed post-hearing briefs.  ([84]; [86]).  On July 18, 2017, Magistrate Judge King issued her R&R, recommending that

Alfred's Suppression Motions be denied and that his Severance Motion be granted. The Magistrate Judge found that the search warrant was adequately supported by probable cause and, even if it was not, the good faith exception applied because the officers reasonably relied on the warrant to search Alfred's residence. The Magistrate Judge further found that the items seized during the search were covered by the warrant or were lawfully seized under the "plain view" doctrine. The Magistrate Judge also found that Alfred voluntarily consented to the vehicle search, and that Alfred's Severance Motion should be granted, including because the Government agreed that severance was warranted.

On August 1, 2017, Alfred filed his Objections to the R&R. Alfred generally objects to the Magistrate Judge's finding that his consent to the vehicle search was voluntary. (Objections [91] at 1-3). Alfred also objects to the Magistrate Judge's recommendation that the Residence Suppression Motion be denied. Alfred argues that the Affidavit and Application to search his residence did not establish "sufficient probable cause to connect the residence to criminal activity." (Objections [91] at 3). Alfred further argues that Agent Dorman "went beyond the scope of the search warrant when [he] looked into [Alfred's] bag and found credit cards in it," because the agent "did not know what was in it when he opened the bag." (Objections [91] at 3-4).

## II.     LEGAL STANDARD

After conducting a careful and complete review of the findings and

recommendations, a district judge may accept, reject, or modify a magistrate

judge's report and recommendation.  28 U.S.C. § 636(b)(1);

Williams v. Wainwright, 681 F.2d 732 (11th Cir. 1982), cert. denied, 459 U.S.

1112 (1983).  A district judge "shall make a *de novo* determination of those

portions of the report or specified proposed findings or recommendations to which

objection is made."  28 U.S.C. § 636(b)(1).  With respect to those findings and

recommendations to which objections have not been asserted, the Court must

conduct a plain error review of the record.  United States v. Slay, 714 F.2d 1093,

1095 (11th Cir. 1983).

Alfred objects to the Magistrate Judge's findings that the search warrant was

supported by probable cause, that the credit cards found in Alfred's bag were

lawfully seized under the plain view doctrine, and that Alfred voluntarily

consented to the search of his vehicle.  The Court conducts a *de novo* review of

these findings, and conducts a plain error review of the remaining portions of the

R&R to which Alfred did not specifically object.  See id.; Marsden v. Moore,

847 F.2d 1536, 1548 (11th Cir. 1988) ("Parties filing objections to a magistrate's

report and recommendation must specifically identify those findings objected to.

Frivolous, conclusive, or general objections need not be considered by the district court.").[5]

## III. DISCUSSION

### A. Alfred's Objection to the Finding and Recommendation that his Residence Suppression Motion be Denied

#### 1. Validity of the Search Warrant

Alfred claims the search warrant was not supported by probable cause, and thus was invalid, because the Affidavit "does not link the alleged criminal activity, firearm violations, to [Alfred's] home at 352B Asbury Commons, Atlanta, Georgia." ([86] at 5). A search warrant must be "supported by an affidavit establishing probable cause." United States v. Lambert, 887 F.2d 1568, 1571 (11th Cir. 1989). "Probable cause to support a search warrant exists when the totality of the circumstances allow a conclusion that there is a fair probability of finding contraband or evidence at a particular location." United States v. Brundidge, 170 F.3d 1350, 1352 (11th Cir. 1999). "A magistrate's determination of probable cause should be paid great deference by reviewing courts." Illinois v. Gates, 462 U.S. 213, 236 (1983). "[S]o long as the magistrate had a

---

[5]     Although the Court conducts a plain error review of the portions of the R&R to which Alfred did not object, the Court would reach the same conclusions expressed in this Order even if Alfred had filed additional objections and the Court conducted a *de novo* review of all of the Magistrate Judge's findings.

substantial basis for concluding that a search would uncover evidence of wrongdoing, the Fourth Amendment requires no more." Id.

Where, as here, the government seeks to search defendant's home for evidence of criminal activity, "the affidavit must supply the authorizing magistrate with a reasonable basis for concluding that Defendant might keep evidence of his crimes at his home, i.e., a safe yet accessible place." United States v. Kapordelis, 569 F.3d 1291, 1310 (11th Cir. 2009). "There need not be an allegation that the illegal activity occurred at the location to be searched." Id. "Evidence that the defendant is in possession of contraband [or other evidence] that is of the type that would normally expect to be hidden at their residence will support a search." United States v. Anton, 546 F.3d 1355, 1358 (11th Cir. 2008) (finding that a warrant to search the defendant's home for evidence of a firearms offense was valid). Courts often "allow a search of a person's residence when that person is suspected of criminal activity" because "[i]n normal situations, few places are more convenient than one's residence for use in planning criminal activities and hiding fruits of a crime." Kapordelis, 569 F.3d at 1310.

The Court finds, and Alfred does not dispute, that the Affidavit established probable cause that Alfred "straw purchase[d] firearms and illegally smuggle[d] them to Trinidad." (Affidavit ¶ 7). Agent Gray testified, in the Affidavit, that

evidence of firearms trafficking often includes documents, electronic devices, photographs, and online records. (Affidavit ¶¶ 8-12). This evidence is "of the type that would normally expect to be hidden at [the defendant's] residence." Anton, 546 F.3d at 1358. Agent Gray testified explicitly that some of this evidence typically is found in the residence of a firearms trafficker. (See, e.g., Affidavit ¶ 11); see United States v. Leach, 498 Fed. App'x. 915, 917 (11th Cir. 2012) ("Opinions and conclusions of experienced agents regarding a set of facts are a factor in the probable cause equation."). Magistrate Judge Anand had "a reasonable basis for concluding that [Alfred] might keep evidence of his crimes at his home." Kapordelis, 569 F.3d at 1310; see United States v. Jenkins, 901 F.2d 1075, 1081 (11th Cir. 1990) ("[T]he combination of a finding of probable cause that Jenkins committed the theft, the fact that the contraband stolen was composed of items which are capable of being hidden in a residence, and the statement of an agent [that people hide stolen items in their homes] provided sufficient probable cause to justify a search of Jenkins' home."). Having conducted a *de novo* review of the record, the Court agrees with the Magistrate Judge that the search warrant was valid and that the Affidavit established an adequate nexus between Alfred's criminal activity and his residence.

## 2. Good Faith Exception to the Exclusionary Rule

The Magistrate Judge found that, even if the Affidavit did not establish probable cause, evidence obtained from Alfred's residence is not required to be suppressed because the "good faith exception" applies. Alfred does not specifically object to this finding and the Court thus reviews it for plain error. See Slay, 714 F.2d at 1095; Marsden, 847 F.2d at 1548.

The good faith exception "allows courts to admit evidence obtained by [law enforcement] officers in reasonable reliance upon search warrants ultimately found to be unsupported by probable cause." Anton, 546 F.3d at 1358. "[I]n the absence of an allegation that the magistrate abandoned his detached and neutral role, suppression is appropriate only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause." United States v. Lewis, 262 F. App'x 950, 951-52 (11th Cir. 2008). There is no evidence that Magistrate Judge Anand lacked impartiality or abandoned his judicial role, or that law enforcement officers acted dishonestly or recklessly in preparing the Affidavit. The fifteen-page Affidavit included details about several interviews with the Defendants, and provided substantial incriminating information about Alfred's role in the offenses alleged. The Magistrate Judge concluded that the good faith exception applies in

this case and that the officers reasonably believed there was probable cause for the search.  The Court finds no plain error in this determination.

3.    Items Seized During Execution of the Search Warrant

Alfred claims several items seized from his apartment were not covered by the search warrant and thus should be suppressed.  The Magistrate Judge found that the following items seized from Alfred's apartment fell within the scope of the search warrant:  Alfred's smart phone, laptop, driver's license, passports, social security card, money orders, receipts, and ledger.  (R&R at 26).  Alfred did not specifically object to this conclusion, and the Court finds no plain error in the Magistrate Judge's determination.

Alfred does object to the Magistrate Judge's conclusion that the credit cards, found inside Alfred's bag, were properly seized under the plain view doctrine. "An officer may seize evidence that is in plain view despite the failure to obtain a search warrant if two elements are satisfied:  (1) lawful access to the object seized, and (2) the incriminating nature of the object seized is immediately apparent." United States v. Hromada, 49 F.3d 685, 690 n.11 (11th Cir. 1995).  "For an item's incriminating character to be 'immediately apparent,' the police merely need probable cause to believe that the item is contraband" or evidence of a crime. United States v. Susini, 261 F. App'x 270, 273 (11th Cir. 2008); see United

States v. Lisbon, 835 F. Supp. 2d 1329, 1362 (N.D. Ga. 2011). Probable cause "merely requires that the facts available to the officer would warrant a man of reasonable caution in the belief . . . that certain items may be contraband or stolen property or useful as evidence of a crime; it does not demand any showing that such a belief be correct or more likely true than false." Texas v. Brown, 460 U.S. 730, 742 (1983). "A practical, nontechnical probability that incriminating evidence is involved is all that is required." Id. "An example of the applicability of the 'plain view' doctrine is the situation in which the police have a warrant to search a given area for specified objects, and in the course of the search come across some other article of incriminating character." United States v. Smith, 459 F.3d 1276, 1290 (11th Cir. 2006).

Agent Dorman had "lawful access" to the credit cards because they were found during his execution of a valid search warrant. Hromada, 49 F.3d at 690 n.11. It was during Agent Dorman's search of Alfred's residence that he saw a bag in the kitchen that was large enough to contain items covered by the search warrant. Agent Dorman searched the bag and found several credit cards in it, including some in Alfred's name. Although Agent Dorman was required to open Alfred's bag to access the credit cards, this was permitted by the search warrant. See United States v. Jackson, 120 F.3d 1226, 1228 (11th Cir. 1997) ("[A] search

may be extensive as reasonably necessary as required to locate the items described in the warrant, and is generally not limited by the possibility that separate acts of entry or opening may be required to complete the search."); see also United States v. Folk, 754 F.3d 905, 911 (11th Cir. 2014) (stating that officers are "permitted to break open locked containers which may contain the objects of the search"). The first element of the plain view doctrine is satisfied.

The Court also finds that the second element of the plain view doctrine is met here, because the incriminating nature of the credit cards was "immediately apparent" in light of other items in Alfred's residence. Hromada, 49 F.3d at 690 n.11. When the officers entered Alfred's apartment, they saw, on the couch in the living room, several credit cards, a laptop computer, and a credit card skimmer attached to the laptop. (Tr. at 16, 52-53). Agents Dorman and Gray believed, based on their experience and training, that these items were evidence of "financial credit card transaction fraud." They discussed their concerns with Agent Judkins, who previously worked for the Secret Service. Agent Judkins said he had seen the devices "multiple times" during his career, and that they were evidence of "credit card fraud." (Tr. at 16-18, 43, 53; [90.1] at 2-4). It was after this conversation that Agent Dorman found the credit cards in the bag in Alfred's kitchen. Agent Dorman seized the credit cards because he "believed that they were . . . indicative

of some sort of financial transaction card fraud." (Tr. at 55). This belief was reasonable in light of the other items found in Alfred's apartment, his conversation with Agent Judkins, the fact that "some of the credit cards were not in Mr. Alfred's name," and "just the sheer volume" of cards found in the bag. (Tr. at 55). Having conducted a *de novo* review of the record, the Court agrees with the Magistrate Judge that the credit cards found in Alfred's bag were properly seized under the plain view doctrine.[6] Alfred's objections to the Magistrate Judge's denial of his Residence Suppression Motion are overruled.

      B.      <u>Alfred's Objection to the Finding and Recommendation that his Vehicle Suppression Motion be Denied</u>

Alfred seeks to suppress evidence obtained from the officers' search of his vehicle, on the grounds that his consent to the search was not voluntary. Law enforcement officers, "possessing neither reasonable suspicion nor probable cause, may nonetheless search [a vehicle] without a warrant so long as they first obtain the voluntary consent of the individual in question." <u>United States v. Blake</u>, 888 F.2d 795, 798 (11th Cir. 1989). "In order for consent to a search to be deemed voluntary, it must be the product of an essentially free and unconstrained choice.

---

[6]      The Magistrate Judge also found that Alfred's other credit cards, credit card skimmer, and credit card embosser were properly seized under the plain view doctrine. Alfred did not file objections to this conclusion, and the Court finds no plain error in the Magistrate Judge's determination.

United States v. Garcia, 890 F.2d 355, 360 (11th Cir. 1989). "The government bears the burden of proving both the existence of consent and that the consent was not a function of acquiescence to a claim of lawful authority but rather was given freely and voluntarily." Blake, 888 F.2d at 798. "Whether a suspect voluntarily gave consent to a search is a question of fact to be determined by the totality of the circumstances." Id.

"[D]etermining whether consent was voluntary is not susceptible to neat talismanic definitions; rather, the inquiry must be conducted on a case-by-case analysis." United States v. Acosta, 363 F.3d 1141, 1151 (11th Cir. 2004). The Eleventh Circuit has identified "a non-exhaustive list of relevant factors to consider when making the assessment of whether consent to a warrantless search is voluntary:"

> [V]oluntariness of the defendant's custodial status, the presence of coercive police procedure, the extent and level of the defendant's cooperation with police, the defendant's awareness of his right to refuse to consent to the search, the defendant's education and intelligence, and, significantly, the defendant's belief that no incriminating evidence will be found.

Blake, 888 F.2d at 798.

The facts here show that Alfred voluntarily consented to the vehicle search. Although approximately twelve to fifteen officers entered Alfred's apartment, only Agents Gray and Lienwand were in the room where Alfred was interviewed. See

United States v. Garcia, 890 F.2d 355, 362 (11th Cir. 1989) (finding no coercion where "all fourteen agents were [not] in the living room while Garcia was being asked for his consent to the search").  Alfred was allowed to get dressed before the interview.  He was given a chair to sit on.  An audio recording of the interview shows that the officers' tone was pleasant, non-threatening, and non-coercive. (R&R at 9 n.4).  Alfred was calm, cooperative and did not appear to be under stress.  (R&R at 9 n.4).  When Agent Gray asked for permission to search Alfred's vehicle, Alfred agreed and executed a "Consent to Search" form, which provided:

> I understand that I have a right to refuse to give my consent to a search and may demand that a search warrant be obtained prior to any search of the person or property described below.
>
> I understand that any contraband or evidence of a crime found during the search can be seized and used against me in any court of law or other proceeding.
>
> I understand that I may consult with an attorney before or during the search.
>
> I understand that I may withdraw my consent to this search at any time prior to the search's termination.
>
> This consent to search has been given voluntarily without promises, threats, coercion or force of any kind whatsoever.
>
> I have read the above statement of rights, understand these rights, and hereby authorize agents of the Bureau of Alcohol, Tobacco, Firearms and Explosives to conduct a complete search of the property described below.

([90.1] at 7; Tr. at 24-25).

Alfred was not handcuffed when he executed the form and he remained unhandcuffed for the remainder of his interview with the officers.  (Tr. at 40). Agent Gray testified that there were no indications that Alfred's consent was involuntary or that he did not understand "what he was doing."  (Tr. at 25-26). Alfred did not withdraw his consent or tell the officers to stop searching his car. (Tr. at 26).  Agents Gray and Lienwand were not "looming over" Alfred, did not threaten him, did not yell at him, and did not make him any promises.  (Tr. at 26, 42); see United States v. Alim, 256 Fed. App'x. 236, 239 (11th Cir. 2007) ("[T]he absence of intimidation, threats, abuse (physical or psychological), or other coercion is a circumstance weighing in favor of up-holding what appears to be a voluntary consent.").  The officers' weapons were not drawn during the interview. (Tr. at 26).  Alfred later asserted his Fifth Amendment right to remain silent, further supporting that his consent to the vehicle search was voluntary.  (Tr. at 21, 40-41).  That Alfred was in custody when he agreed to the vehicle search does not render his consent involuntary.  See United States v. Witten, 649 Fed. App'x. 880, 887 (11th Cir. 2016) ("That Witten was in police custody at the time he consented to the search does not render the consent involuntary.").

The Eleventh Circuit has found that a defendant's consent was voluntary in more extreme circumstances than those presented here. For example, in United States v. Espinosa-Orlando, 704 F.2d 507 (11th Cir.1983), four federal agents arrested defendant at gunpoint and forced him to lay on the grass next to the road. While defendant was lying on the ground, and while one agent still had his weapon drawn, the agents asked defendant for permission to search his car. Defendant answered affirmatively. The Eleventh Circuit held that defendant's consent was voluntary, including because the agents' search request was made "in a normal conversational tone," there were "no abusive language or physical threats," and the defendant was not "handcuffed, placed within a police vehicle, or transported from the location of the stop." Id. at 513.

In Garcia, 890 F.2d 355, fourteen federal agents arrested the defendant in his front yard and conducted a security sweep of his home. The defendant was so nervous that he soiled his undergarments during the arrest. The agents searched the defendant for weapons, read him his Miranda rights, and requested permission to search "the entire premises." Id. at 361. Defendant consented only to a limited search. "The agents refused this conditional consent and requested consent to search the entire premises or else they would have to secure the house and apply for a search warrant." Id. The defendant then agreed to the search. The Eleventh

Circuit held that defendant's consent was not coerced, including because there was "no evidence to indicate that the officers were attempting to harass or intimidate [defendant]" or that they "employed any tactics that would augment the degree of coercion that is inherent in any arrest."  Id. at 362.  See also United States v. Hidalgo, 7 F.3d 1566, 1570-71 (11th Cir. 1993) (finding that consent was not coerced where defendant "was arrested by SWAT team members who broke into his home in the early morning, woke him, and forced him to the ground at gunpoint, and [defendant] invoked his right to remain silent before consenting to the search"); United States v. Long, 866 F.2d 402, 405 (11th Cir.1989 (holding that the defendant voluntarily consented to the officers' search request, even though the officers stated that they would "return and dig the place up" if permission was not granted).

Having conducted a *de novo* review of the record, the Court agrees with the Magistrate Judge that Alfred voluntarily consented to the search of his vehicle. Alfred's objections to the R&R are overruled, and his Vehicle Suppression Motion is denied.

     C.     <u>The Magistrate Judge's Recommendation that Alfred's Severance Motion be Granted</u>

Alfred seeks to sever Counts 19 and 20 from the other counts in the Superseding Indictment.  Rule 14 of the Federal Rules of Criminal Procedure

provides: "If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." Fed. R. Crim. P. 14(a).

Alfred is charged, in Counts 1 through 18, with committing firearms offenses from August 2013 through September 2014. Counts 19 and 20 charge Alfred with unrelated fraud offenses allegedly committed two years later, namely, the possession of "counterfeit and unauthorized access devices"—and "device-making equipment"—with "intent to defraud." ([65] at 14). The Government agrees that Counts 19 and 20 should be severed from the other counts in the Superseding Indictment. ([84] at 2). The Magistrate Judge recommends granting Alfred's Severance Motion, and the Court finds no plain error in this recommendation. See United States v. Heard, No. 1:12-cr-40, 2013 WL 1966299, at *7 (M.D. Ga. May 10, 2013) (severing a count because it "involve[d] a different set of facts, a different offense, and an entirely different aim than [the other counts]" and because "the indictment does not allege *any* connection" between the count sought to be severed and the remainder of the indictment). Alfred's Severance Motion is granted, and Counts 19 and 20 are severed from the other counts in the Superseding Indictment.

## IV. CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Magistrate Judge Janet F. King's Report and Recommendation [88] is **ADOPTED**.

**IT IS FURTHER ORDERED** that Defendant Errol Alfred's Objections to the Magistrate's Report and Recommendation of July 18, 2017 [91] are **OVERRULED**.

**IT IS FURTHER ORDERED** that Defendant Errol Alfred's Motion to Suppress Search of 352B Asbury Commons, Atlanta, Georgia [50] is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant Errol Alfred's Motion to Suppress Search of Defendant's Car and the Seizure of Items in the Car [56] is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant Errol Alfred's Motion to Sever [78] is **GRANTED**, and that Counts 19 and 20 are **SEVERED** from the other counts in the Superseding Indictment [65].

**SO ORDERED** this 17th day of August, 2017.


WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE